IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**UNITED STATES OF AMERICA,**
**ex rel. KEVIN GRAY**                                                    **PLAINTIFF**

**VS.**                             **CIVIL ACTION: 3:15-CV-000127-MPM-JMV**

**MITIAS ORTHOPAEDICS, PLLC,**
**and HANNA M. MITIAS, M.D.**                                         **DEFENDANTS**

**ORDER**

This cause comes before the court on the joint motion of defendants Mitias Orthopaedics, PLLC and Hanna M. Mitias, M.D. ("defendants") for summary judgment, pursuant to Fed. R. Civ. P. Rule 56. Plaintiff United States of America *ex rel* Kevin Gray has responded in opposition to the motion, and it has filed its own competing motion for summary judgment. The parties have also filed competing *Daubert* motions to strike certain expert testimony offered by the opposing side. This court, having considered the memoranda and submissions of the parties, is prepared to rule.

This is a *qui tam* action brought pursuant to the False Claims Act, 31 U.S.C. § 3729 ("FCA), based on allegations that defendants submitted false claims for Medicare reimbursements based on treatments which were not actually provided. The plaintiff alleges that defendants treated patients with hyaluronic acid ("HA"), a viscosupplementation agent used to treat osteoarthritis of the knee, which was not FDA approved, and that defendants submitted false Medicare billing in connection with these treatments. Specifically, the intervenor's complaint alleges that defendants falsely represented to Medicare that they were using name-

1

brand variants of HA as opposed to compounded or generic HA, thus causing the HA to be *per se* not reimbursable by Medicare.

This court considers these allegations in the context of the FCA, which imposes liability upon anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B); *United States ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 376 (5th Cir. 2004). A "claim" includes direct requests for government payment as well as reimbursement requests made to the recipients of federal funds under a federal benefits program. 31 U.S.C. § 3729(b)(2)(A). "In determining whether liability attaches under the FCA, this court asks (1) whether there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a claim)." *United States ex rel. Harman v. Trinity Indus. Inc.,* 872 F.3d 645, 654 (5th Cir. 2017) (citations omitted).

The third factor, relating to materiality, is often a key one in FCA cases, and, in addressing it, this court must be cognizant of the U.S. Supreme Court's decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 195 L. Ed. 2d 348 (2016). In *Escobar*, the Supreme Court established a rather stringent standard of materiality, which the Fifth Circuit recently described as follows:

> The Supreme Court recently elaborated on the factors that lower courts should consider in determining materiality under the FCA. In *Universal Health Services, Inc. v. United States ex rel. Escobar,* the Court considered whether the so-called "implied false certification" theory can be a basis for FCA liability. The Court held in the affirmative, and stated that "liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory or contractual requirement. In these circumstances, liability may attach if the omission renders those

2

representations misleading." In other words, the Supreme Court made clear that defendants could be liable under the FCA for violating statutory or regulatory requirements, whether or not those requirements were designated in the statute or regulation as conditions of payment.

After their daughter's death, the relators in *Escobar* filed a qui tam suit against the defendant health provider for submitting reimbursement claims for medical services but failing to disclaim serious violations of regulations pertaining to qualifications and licensing requirements for staff performing these services. The petition alleged that the medical provider flouted regulations requiring that mental health services be performed by properly licensed clinicians (i.e., psychiatrists, social workers, or nurses). The plaintiffs' claim was based on the fact that medical benefits were paid based on requests for reimbursement for services performed by unlicensed, unqualified, and unsupervised staff—in violation of regulations that did not expressly provide that compliance was a condition of payment for these services. The defendant, Universal Health Services, however, argued that because the regulations did not make compliance with licensing and other provider qualifications conditions of payment, the violations could not be material.

The Supreme Court rejected Universal Health's argument, holding that "when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive." In explaining its refusal to adopt a flat rule that billing for services without complying with a requirement expressly made a condition of payment is material, the Court stated: "Under Universal Health's view, misrepresenting compliance with a requirement that the Government expressly identified as a condition of payment [without regard to its importance] could expose a defendant to liability. Yet, under this theory, misrepresenting compliance with a condition of eligibility to even participate in a federal program when submitting a claim would not."

*Escobar* explained some of the evidence relevant to the materiality issue: (1) "the Government's decision to expressly identify a provision as a condition of payment" and (2) "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement." Moreover, (3) materiality "cannot be found where noncompliance is minor or insubstantial." The Supreme Court remanded *Escobar* to the First Circuit to reconsider materiality in light of these factors.

*United States ex rel Lemon v. Nurses To Go, Inc.,* 924 F.3d 155, 159–60 (5th Cir. 2019).

In its January 11, 2021 order denying the motion to dismiss filed by defendants, this court set forth in considerable detail its evaluation of the facts of this case, and it explained why, in its view, a jury trial would very likely be required in this matter. For example, regarding the materiality standard, this court wrote that "while … *Escobar* sets the materiality bar high, . . . the Intervenor's Complaint includes extensive allegations which, if supported by proof in discovery,

3

might lead a reasonable jury to conclude that defendants acted with the requisite degree of knowledge of wrongdoing, even under this stringent standard." [Slip op. at 5]. In concluding that jury issues likely existed regarding Dr. Mitias' state of mind, this court put particular emphasis on the fact that his acts of procuring generic HA products, while using billing codes for name-brand products, allowed him to greatly increase his profits, at taxpayer expense. This court noted its skepticism that Dr. Mitias could have genuinely believed that Medicare would have been amenable to such an arrangement, writing that:

> While the Intervenor's Complaint notes Dr. Mitias' position that the words "or derivative" in the billing code allowed him to use the codes for brand name HA products while actually administering pharmacy-prepared compounded products to patients, this court regards the issue of his state of mind in light of this language (including his level of scienter) as a jury issue.

[*Id.* at 11]. In explaining its skepticism in this regard, this court further wrote that:

> This court admits to a considerable degree of skepticism regarding Dr. Mitias' position in this case, based partly upon the issue of reimbursement rates. The Intervenor's Complaint alleges, and an internet search confirms, that prior CMS rulemaking has tied reimbursement rates for particular drugs to the cost of obtaining them. . . . This court presumes that, as a physician, Dr. Mitias was aware that Medicare generally ties reimbursement rates to the costs of the drugs in question. That being the case, this court wonders how Dr. Mitias could have sincerely believed that, by including the words "or derivative" in the billing code for brand-name HAs, Medicare was expressing a willingness to pay the same reimbursement rate for compounded HAs obtained from a pharmacy at a comparatively low cost as it would for the actual brand-name HAs, obtained at a much higher cost. This seems to fly in the face of Medicare's normal reimbursement rate practices, and the notion that the Government would have been content to allow Dr. Mitias to pocket the difference in this regard frankly strikes this court as far-fetched. Indeed, this court wonders why, from a purely financial perspective, a physician would *ever* choose to use name-brand HAs if he could lawfully do what Dr. Mitias did in this case. This court therefore doubts that Dr. Mitias sincerely believed that the words "or derivative" in the billing codes gave him a legal right to do what he did in this case.

[*Id.* at 12-13].

In considering defendants' summary judgment motion following discovery, this court finds it interesting that not only do they fail to contest the logical basis for this court's skepticism

4

stated above, their briefing actually *confirms* that Dr. Mitias developed his own skepticism regarding whether it was proper to bill for (cheaper) compounded HA using name-brand HA codes. In their briefing, defendants assert that Dr. Mitias was initially taken in by representations from sales representatives from U.S. Compounding, a company engaged in the business of providing compounded HA products, that using billing codes for name-brand HA products was acceptable. [Brief at 25]. Defendants further explain, however, that Dr. Mitias later recognized that such representatives had a financial interest in making these assertions, and they assert that he developed doubts regarding their accuracy. Specifically, defendants write that:

> Once other sales representatives – those whose livelihood depended on selling as much of their HA product as possible – began to give Dr. Mitias contradictory information about coding for HA, Mitias sought out Brian Turner to verify the past guidance. [*Id.* at 25-26]. Turner not only reiterated the guidance, but provided Dr. Mitias with a letter from the American Hospital Association that provided an example of a CPT code Mitias was familiar with – J7321 – that expressly identified being applicable to multiple products – which is what Mitias was accustomed to. (See section I, supra p. 10). Still, Mitias decided to task his staff with reaching out to various insurance pay sources – including Medicare – to try and get a clear answer on which position was correct. (Ex. "C" at 22-25, Ex. "K" at 8-9). Despite being told that a derivative of hyaluronan should be coded with the closest matching code, Mitias decided the guidance was not clear enough and that he needed to make a change. (Ex. "C" at 25). Mitias made the decision on his own to stop using compounded HA. (Id.).

[Brief at 25-26].

In the court's view, the fact that dubious representations made by salesmen with a profit motivation should be viewed with skepticism is something which Dr. Mitias likely should have known from the start. This court therefore believes that a jury should evaluate the credibility of Dr. Mitias' assertion that he only developed skepticism in this regard at a later date. This court further notes that there is no written record regarding the alleged inquiries made by Dr. Mitias's staff with Medicare; defendants would instead have this court accept the accuracy of their employees' self-serving testimony regarding these matters. It seems clear to this court, however,

5

that if Dr. Mitias had developed sufficient concerns regarding the legality of his billing practices to warrant inquiries with Medicare on the issue, then he should have made these inquiries in writing, so as to produce a clear record. Assessing the reliability of self-serving testimony from witnesses is a classic jury function, and, at any rate, defendants themselves write that Dr. Mitias "decided the guidance was not clear enough and that he needed to make a change." [*Id.*]

Defendants thus concede that Dr. Mitias developed the same skepticism expressed by this court, and it therefore appears that the issue in this context is "what Dr. Mitias knew (or suspected) and when he knew it." Making an assessment in this regard is, once again, a classic jury function. This court believes that a jury might reasonably conclude that Dr. Mitias simply "wanted to believe" that Medicare would have approved of him making considerable profits at taxpayer expense by billing for compounded HA products using codes for name-brand HA products, and this was, in fact, the Relator's impression of Dr. Mitias' state of mind after discussing the matter with him. (Relator depo. at 170-79).

This court already expressed its views on these issues in denying defendants' motion to dismiss, and, in their summary judgment briefing, they cite no evidence which would cause it to revise its opinion in this regard. Of course, a jury may reach a more charitable conclusion regarding Dr. Mitias' state of mind, and indeed, it is possible that this court will revise its own impressions regarding this issue after viewing the evidence at trial. At this juncture, however, nothing in defendants' summary judgment briefing has altered this court's previously-stated conclusion that a jury trial will be required in this case, and it would simply reiterate its lengthy discussion of this issue in its order on the motion to dismiss.

This court notes that plaintiff has filed its own motion for summary judgment in this case, but its conclusion that triable jury issues exist in this case applies equally to that motion. In so

6

stating, this court notes that the arguably confusing nature of some of the billing codes at issue in this case may work in defendants' favor at trial, and jurors may also accept as credible the testimony from Dr. Mitias' staff that they made inquiries with Medicare, thereby giving rise to a valid defense to the stringent scienter requirements of the FCA. This court further notes that each side seeks for it to make partial summary judgment rulings on such issues as statute of limitations, but, in cases where it is clear that a trial will be required regardless, its general practice is to first observe the evidence at trial and then decide, at the directed verdict and/or jury instruction phase of trial exactly which claims should be submitted to a jury. This approach reflects the reality that this court will know considerably more about the facts of this case after viewing the evidence at trial, and it therefore makes sense to narrow down the specific claims at trial, rather than at this juncture.

In light of the foregoing, the parties' competing summary judgment motions will be denied, and this court now turns to the *Daubert* motions filed by each side in this case. In this vein, this court has previously recognized its duty "to screen a proffered expert's testimony to determine admissibility." *Childs v. Entergy Miss., Inc.*, 2009 WL 2508128, *2 (N.D. Miss. Aug. 13, 2009). "Expert testimony is not admissible unless the expert is qualified and the opinion is scientifically valid and methodologically sound." *Miller v. Genie Indus., Inc.*, 2012 WL 161408, at *4 (N.D. Miss. Jan. 19, 2012) (*citing Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Regarding an expert's qualifications, "[d]istrict courts must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.' " *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (citing Fed. R. Evid. 702).

It is well settled that "[a] proposed expert does not have to be 'highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility.'" *Bryant v. 3M Co.,* 78 F. Supp. 3d 626, 631 (S.D. Miss. 2015) (*quoting Huss v. Gayden,* 571 F.3d 442, 452 (5th Cir. 2009)). Moreover, "[a] lack of personal experience ... should not ordinarily disqualify an expert, so long as the expert is qualified based on some other factor provided by Rule 702: 'knowledge, skill, experience, training, or education.' " *U.S. v. Wen Chyu Liu*, 716 F.3d 159, 168 (5th Cir. 2013) (quoting Fed. R. Evid. 702) (emphasis in original). The Court also notes that the proponent of expert testimony bears the burden to establish the witness's qualifications by a preponderance of the evidence. *U.S. v. Griffith*, 118 F.3d 318, 322 (5th Cir. 1997).

Turning to the substance of the expert's proposed testimony, "the overarching concern is whether or not it is relevant and reliable." *Smith v. Goodyear Tire & Rubber Co.,* 495 F.3d 224, 227 (5th Cir. 2007). Regarding relevance, the testimony must "assist the trier of fact to understand the evidence or determine a fact in issue[.]" *Childs,* 2009 WL 2508128, at *2. The relevance requirement is satisfied "where there is a sufficient relationship between the subject of the proffered testimony and the facts of the case, so that the testimony aids the factfinder in resolving a disputed issue." *Id.* (additional citations omitted). As to reliability, "[a] party seeking to introduce expert testimony must show '(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.'" *Smith,* 495 F.3d at 227 (*citing* Fed. R. Evid. 702). "Proposed testimony must be supported by appropriate validation— i.e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony

8

pertains to 'scientific knowledge' establishes a standard of evidentiary reliability." *Reed v. Flores,* 2010 WL 5051474, at *2 (N.D. Miss. Dec. 3, 2010) (*quoting Daubert,* 509 U.S. at 590). The Court must also "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* (*quoting Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)) (additional citations omitted). Additionally, "[t]he party offering the expert testimony bears the burden of proving that the testimony is admissible." *Miller,* 2012 WL 161408, at *4.

With this authority in mind, this court first considers plaintiff's *Daubert* motion to strike the testimony of Dr. Chris Kneip. In seeking to strike Dr. Kneip's testimony, plaintiff argues that:

> Dr. Kneip is an orthopedic surgeon. His training and experience are in the practice of medicine, and, were he offering relevant testimony about the practice of orthopedic medicine, the Government would not be questioning his expertise. However, Dr. Kneip's testimony scarcely touches upon the actual practice of medicine. * * * Instead, Dr. Kneip touches on a variety of topics that do not call upon his training or experience. Moreover, the only documents he reviewed in support of his testimony are the complaints and Dr. Mitias's deposition. In sum, Dr. Kneip was retained simply to support Dr. Mitias's testimony, even though he personally has no experience with the issues in this case.

[Brief at 3]. Having reviewed the briefing of both parties, this court agrees with plaintiff that there are a number of instances in which Dr. Kneip appears to step outside of his area of expertise and offers opinions as to which defendants have failed to demonstrate that he is qualified to testify. In their motion, plaintiff takes particular exception to Dr. Kneip offering his opinion that "physicians would consider hyaluronic acid to be a drug and not a device." In objecting to this testimony, plaintiff writes that:

> Defendants argue that Dr. Kneip is qualified to speak on this subject because he reviewed a 2018 FDA publication that, purportedly, "publicly acknowledged that HA used to treat OA of the knee meets the statutory definition of a drug and not a device." Report at 1. Dr.

9

> Kneip's only familiarity with the document was due to Defendants giving him a copy prior to his testimony. Deposition, 29:10-23. Prior to that, it "never mattered to [him] at all." *Id.* He even misunderstands what this publication—a notice permitting manufacturers to submit evidence that their particular product is a drug—actually says. As of the date of this filing, every hyaluronic acid injection approved by the FDA has been classified, and remains classified, as a device.
>
> Dr. Kneip is also not qualified to opine regarding the science of how the different viscosupplementation agents work. His testimony and CV establish he lacks any qualifying experience or knowledge to testify on these issues, which is based solely on his personal "clinical use of the products." *See, e.g.,* Deposition, 30:1-32:12 (no knowledge or understanding of how the products were made, how molecular weight affects efficacy, or the chemical reactions that occur within the knee). Since he has never even used the Compounded Products—or Hyalgan, Supartz, or Orthovisc, which collectively make up two of the three product-specific billing codes at issue in this case—he is certainly not qualified to testify regarding how they worked, either generally or in comparison to one another.

[Reply brief at 4].

> For their part, defendants respond that:
>
> > Plaintiffs' motion as to this opinion might have some merit to the extent they will not offer any testimony that the compounded HA in this case is not FDA approved because it is a device requiring a specific FDA approval process *or* that Defendants should have known not to select the closest J code because, in part, they are only for HA medicines approved as devices. If, however, Plaintiffs intend to submit either premise to the jury, then Dr. Kneip's testimony that he considers HA to be a drug is highly relevant. In addition to his own clinically based experience, Dr. Kneip testified that he reviewed the FDA's acknowledgement in 2018 that HA used to treat Osteoarthritis of the knee meets the statutory definition of a drug and not a device [because it operates like a drug in the human body]. (Doc. # 256-2 at 8, Dr. Kneip's Dep. 29).

[Plaintiff's response at 6]. Defendants thus seem to acknowledge that it is unclear whether the drug vs. device distinction will even be a relevant issue at trial, and it appears from plaintiff's briefing that it will not. Even assuming that this issue proves relevant at trial, this court concludes that defendants have not yet established that Dr. Kneip, as an orthopedic surgeon, is qualified to offer expert testimony regarding such technical matters as the drug vs. device distinction and the manner in which the different viscosupplementation agents work. This court

10

will therefore tentatively grant plaintiff's motion to strike any testimony by Dr. Kneip on these matters, barring evidence at trial that he has greater expertise in these areas than has been demonstrated to date.

At the same time, this court leaves open the possibility that Dr. Kneip will have some helpful testimony to offer the jury regarding matters as to which he does have expertise. In so stating, this court notes defendants' argument that "there is no debate as to Dr. Kneip's qualifications as a practicing physician utilizing HA, interacting with pharmaceutical salespeople, deciding when viscosupplementation versus surgery is appropriate, and making decisions on how to code or bill such various orthopedic procedures." [Brief at 4]. This court concludes that, to the extent that Dr. Kneip offers testimony based on his own experience as an orthopedic surgeon and avoids offering testimony regarding matters as to which he lacks expertise, then it is prepared to allow his testimony. This court will not attempt to prejudge, at this juncture, on which side of the ledger each and every piece of testimony which Dr. Kneip might offer falls, and it directs counsel for defendants to only seek to offer testimony as to which they have a good faith argument for admissibility. This court will resolve any additional disputes on this issue at trial, after it has considered arguments from both sides. With this caveat, plaintiff's motion to strike Dr. Kneip's testimony will be granted in part and denied in part.

This court now turns to defendants' motion to strike the testimony of Dr. Juan L. Schaening-Perez, M.D. Plaintiff designated Dr. Schaening-Perez as a hybrid expert and corporate 30(b)(6) witness for CMS to opine about Mitias' claims. This court will interpret defendants' motion to strike as relating only to Dr. Schaening-Perez' testimony in his capacity as an expert, since there appears to be no question about his right to offer 30(b)(6) testimony on behalf of CMS. As to his proposed expert testimony, defendants seek to exclude Dr. Schaening-

Perez from opining as to whether Medicare would cover certain of Defendants' claims had they been submitted under the code J3490,[1] i.e., "whether [Defendants'] claims were reasonable and necessary, or the treatment therein was safe and effective." Dkt. 261 at 20. Specifically, defendants argue that Dr. Schaening-Perez should not be allowed to offer opinions on these issues because he did not review the specific patient records prior to his deposition. *Id.*

For its part, plaintiff initially disputes that the issue of whether a particular claim would have been approved under J3490 is even an essential part of its burden of proof, writing that:

> The Government did not get the benefit of the bargain when it paid the full reimbursement amount for an FDA-Approved Product that Defendants did not actually provide. Thus, Defendants violated the False Claims Act regardless of whether they would have been covered for some amount or not at all. *See U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.,* 342 F.3d 634, 638 n.3 (6th Cir. 2003) ("'Upcoding,' a common form of Medicare fraud, is the practice of billing Medicare for medical services or equipment designated under a code that is more expensive than what a patient actually needed or was provided."). This issue of whether the Compounded Products would have been covered under a different code, therefore, is not directly relevant to the Government's case in chief.

[Brief at 2].

This objection aside, plaintiff argues that any failure on the part of Dr. Schaening-Perez to examine specific patient records does not negate the relevance of his proposed testimony, writing that:

> Dr. Schaening-Perez is prepared to testify to the MAC/CMS process generally as to how J3490 claims are reviewed for medical reasonableness and necessity. If he is given specific claims and records to review for coverage, he is prepared to offer a conclusion by applying the stated methodology. Defendants have presented no case law supporting their argument that he must have done so prior to his deposition, when they had yet to even produce the relevant records or set forth this argument on the record.

[Brief at 4-5].

---

[1] This court discussed the significance of this code in its order on the motion to dismiss, and it will not repeat that discussion here.

In rebuttal, defendants insist that Dr. Schaening-Perez's failure to review claims data and medical records renders his proposed testimony unreliable, writing that:

> It is undisputed that Dr. Schaening-Perez did not do the things Plaintiffs claimed in their designation that he did to form his opinions. Dr. Schaening-Perez did not base his opinions on the review or study of the records and information stated in his designation. He did not review the claims data. He did not review the medical records. He did not review any information about the hyaluronic acid medicine used or the pharmacies that produced it, so he had no basis to opine as to whether it was unregulated or anything about its purity, potency, or molecular weight.

[Reply brief at 3].

After considering the parties' arguments, this court concludes that, by virtue of his position at CMS, Dr. Schaening-Perez has potentially helpful testimony to offer the jury regarding the process by which the agency reviews J3490 claims. At the same time, this court believes that defendants should have every right at trial to point out weaknesses in the manner in which Dr. Schaening-Perez reached his opinions in this case, including any failure to adequately review specific patient charts. That being the case, this court will grant defendants extensive leeway to cross-examine Dr. Schaening-Perez regarding these matters, but it ultimately concludes that any objections in this regard go to the weight, but not admissibility, of his testimony regarding the review of J3490 claims. Ultimately, this court believes that jurors are fully capable of evaluating the validity of defendants' objections to Dr. Schaening-Perez's methodologies, and it will allow them to do so. With this caveat, defendants' motion to strike Dr. Schaening-Perez's testimony will be denied.

This court now turns to plaintiff's motion to strike defendants' expert on coding and billing, Debra Pierce, M.D. In seeking to strike Dr. Pierce's testimony, plaintiff raises a number of objections, both procedural and substantive in nature. Regarding the procedural objections, plaintiff notes that Dr. Pierce's supplementation of her expert report was provided six months too

13

late, although defendants insist that this late supplementation was occasioned by late information provided by plaintiff's own expert, Dr. Schaening-Perez. Defendants emphasize that Dr. Pierce made it clear in her deposition that she would be offering a supplemental report, writing that:

> During the deposition, Dr. Pierce testified that she would be supplementing her original report to address several matters. (*See* Ex. "2" at 15). Dr. Pierce testified that her supplement would address "[u]pdates since the initial report." (*Id.*) She specifically stated that she was going to revise her report based upon the testimony of Dr. Schaening-Perez, whose transcript she had read after preparing her initial report. (*Id.* at 48-49).

[Brief at 2]. This court will assume for the purposes of this order that a six month-delay in providing Dr. Pierce's expert report was excessive, though defendants note that plaintiff could have requested an extension of the discovery deadline but chose not to do so.

This fact aside, this court's overriding concern, in addressing the objections to Dr. Pierce's testimony, is that it regards a trial as a search for truth. Moreover, it does not appear to be an exaggeration to state that, given the very large mandatory damages which exist in FCA actions, defendants find themselves in "bet the company" litigation in this case. Further, this court believes that a jury would best be served, in reaching an accurate and informed verdict in this case, by considering expert testimony from both sides regarding the quite technical and abstruse Medicare billing issues in this case. It should also be noted that, in addressing defendants' motion to strike Dr. Schaening-Perez's proposed testimony, this court concluded that any objections could be raised in cross-examination before a jury and that they go to the weight, rather than admissibility, of that testimony. In light of this fact, it would arguably be unfair to apply a different approach with regard to any substantive weaknesses in Dr. Pierce's testimony.

It is at this point that this court must emphasize that, while *Daubert* and its progeny assign it a "gatekeeper" role regarding expert testimony, this fact does not magically confer upon this court actual expertise regarding such complex matters as the arcana of federal Medicare billing codes and practices. This court is most certainly not an expert regarding these matters

14

and, that being the case, it believes that the wiser course of action, at this point, is for it to "keep its powder dry" regarding many of the differences of opinion which exist between the parties and their experts in this case. Indeed, in reading the competing arguments and opinions which are offered by the parties and their experts in this case, this court frequently finds itself harboring a belief that one side or the other *appears* to have the better of the argument, but this fact by no means indicates that a jury should be prevented from considering the expert testimony of the other side. At trial, both the jury and this court will be provided with an education regarding these complex matters, and, that being the case, it would be unwise to attempt to excessively prejudge these issues based upon mere *appearances* that one side or the other has the better of the arguments in this context.

With these considerations in mind, this court concludes that, while Dr. Pierce should have provided her supplemental report earlier than she did, she is a crucial witness in this case whose testimony would assist jurors in reaching an informed verdict. Dr. Pierce's testimony appears to be particularly crucial considering that this court has previously limited the testimony which Dr. Kneip might offer in this case. Dr. Pierce has far greater expertise in medical billing issues than Dr. Kneip, and this court concludes that, while plaintiff does appear to raise serious questions about the methodologies supporting her testimony, the same could be said about its own expert Dr. Schaening-Perez. This court will therefore adopt the same approach with each expert witness and allow each side extensive opportunity to cross-examine the opposing experts regarding the reliability of their methodologies. Considering the excessive delay in providing Dr. Pierce's supplemental report, however, this court is prepared to grant plaintiff a short trial continuance if it represents that such is necessary for it to adequately prepare for trial. With this caveat, the motion to strike Dr. Pierce's testimony will be denied.

In light of the foregoing, it is hereby ordered that the parties' competing motions for summary judgment [254-1, 262-1, 264-1] are denied. Plaintiff's *Daubert* motion to strike the testimony of Dr. Kneip [256-1] is granted in part and denied in part, and its motion to strike the testimony of Dr. Pierce [258-1] is denied. Defendants' motion to strike the expert testimony of Dr. Schaening-Perez's [260-1] is likewise denied. Defendants' motion to exceed the page limitation [276-1] is granted.

This, the 5th day of April, 2022.


/s/ Michael P. Mills
U.S. DISTRICT COURT