**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| ex rel. KEVIN GRAY, | ) | |
| | ) | |
| Plaintiff-Relator, | ) | Civil Action No: |
| | ) | 3:15-cv-127-MPM-JMV |
| v. | ) | |
| | ) | |
| MITIAS ORTHOPAEDICS, PLLC; CHAMPION | ) | |
| ORTHOPAEDICS DESOTO, P.L.L.C. d/b/a | ) | |
| CHAMPION ORTHOPAEDICS & SPORTS | ) | |
| MEDICINE; and HANNA M. MITIAS, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

## BRIEF IN SUPPORT OF RELATOR'S MOTION FOR ATTORNEYS' FEES, COSTS, AND EXPENSES

Following the successful litigation of his *qui tam* case, Relator Kevin Gray moves the Court for an award of $449,720 in attorneys' fees and $4,735.37 in costs and expenses as provided for in the False Claims Act. Our[1] fee request is based on a lodestar calculation using reasonable rates of $400 per hour for attorneys and $125 per hour for our paralegal multiplied by a total of 1,328.7 hours, an amount of time that is also reasonable, given the nearly eight years our firm has represented Mr. Gray and the resulting $1.9 million recovery.

---

[1] Local counsel has settled its fee claim. To avoid confusing references to "Relator" or "Relator's counsel", this brief is written in the first person. "I" refers to attorney Jason Marcus, lead counsel for Relator. "We" refers to Bracker & Marcus LLC and its members. Relator and the Government are collectively referred to as "Plaintiffs."

## I.    INTRODUCTION

From 2008 through 2015, Defendants injected patients with viscosupplements prepared by compounding pharmacies but billed the Government as if they had used authentic, FDA-approved products. This resulted in a windfall to Defendants, who purchased a cheap knock-off but billed and were reimbursed for the expensive, brand name product.

Defendants would have gotten away with this scheme but for Relator Kevin Gray. In April 2015, Mr. Gray learned of the scheme from Defendants' employees and confronted the practice owner, Dr. Hanna Mitias. Dr. Mitias rejected Mr. Gray's efforts to explain why billing for a different product than was administered was inappropriate. When it became clear that Defendants had no intention of correcting the false billing, Mr. Gray filed this lawsuit.

After more than seven years, Defendants settled this case for $1,909,988.35. As a material term of the settlement, Defendants agreed that Mr. Gray and his counsel are entitled to reasonable attorneys' fees, expenses, and costs from this case.

When determining an attorney's fees award, "the district court should begin by calculating the lodestar: the reasonable hours expended multiplied by a reasonable rate. The district court may then determine whether any other considerations counsel in favor of enhancing or decreasing the lodestar." *Combs v. City of Huntington*, 829 F.3d 388, 394-95 (5th Cir. 2016). These are addressed in turn, below.

## II.    REASONABLE FEES

Bracker & Marcus LLC has represented Relator Kevin Gray since May 2015. For seven and a half years, we actively litigated this case in conjunction with the U.S. Attorney's Office.

This case has been the model for the public-private partnership envisioned by the drafters of the 1986 amendments to the False Claims Act. Although Assistant United States Attorney J. Harland Webster represents the federal government and we represent Mr. Gray, we worked

2

together with a common interest in achieving justice for the American taxpayer and returning ill-gotten funds to the Medicare and Medicaid programs.

The FCA does not distinguish between intervened and non-intervened cases when it comes to an award of attorneys' fees. In either scenario, the statute mandates an award of reasonable attorneys' fees, costs, and expenses against the defendant. 31 U.S.C. § 3730(d)(1) and (2). Furthermore, when the Government intervenes in an action, the False Claims Act grants Relator "the right to continue as a party to the action," and it does so with "unrestricted participation" unless the court orders otherwise, and only after the Government or defendant evince that Relator's participation would be problematic. 31 U.S.C. § 3730(c). No such showing was even attempted in this action.

Accordingly, the first question before the Court is whether the time we spent in this litigation was reasonable. In total, we incurred 1367.6 hours in this case, reduced to 1,328.7 hours. Although it was not required, we consulted with AUSA Webster before engaging on any lengthy project, and we assisted—at his request—with nearly every aspect of this case.

A survey of comparable cases shows this is to be a reasonable amount of time, particularly in light of the many challenges Defendants raised and their discovery conduct. A summary of our time is provided below.

**A. Preparing and Filing the Case: May 2015 through July 2015**

Because of our prior experience with both the facts of viscosupplementation and law of the False Claims Act, we were able to expeditiously draft a complaint and disclosure statement, requiring only 24 hours from the initial intake to case filing in July 2015.

In May 2015, Mr. Gray retained our firm, Bracker & Marcus LLC, to represent him in this lawsuit. He contacted us first because he was aware of our successful lawsuit in *United States ex rel. Estey v. Tennessee Orthopaedic Clinics P.C.*, Docket No. 3:12-cv-85 (E.D. Tenn.),

3

which settled for $1.85 million in January 2014. That case was premised on providers billing the Government for reimported brand name viscosupplements. Accordingly, he knew he was retaining counsel that was not only qualified in the False Claims Act but also had familiarity with the products at issue. We retained Pigott & Johnson, P.A., the only attorneys in Mississippi with meaningful False Claims Act experience, as our local counsel.

### B. The Sealed Investigation: August 2015 through January 2020

From August 2015 through January 2020, when the Government filed its notice of intervention, we incurred only 69.9 hours of time in this case.

After AUSA Feleica Wilson interviewed Mr. Gray at the start of the case, she did not request much assistance from us for the next three years. In June 2018, Defendants sent Ms. Wilson a whitepaper that misstated the extent of the fraud and included dubious legal analysis of our claims. Doc. 264-18. Ms. Wilson requested our assistance in responding to the memo.

In December 2019, we learned that AUSA Webster was replacing Ms. Wilson. Although he was an experienced and well-regarded trial attorney, AUSA Webster was new to the federal government and the False Claims Act. He indicated that were he to intervene and litigate this matter, he would require our help. We agreed.

At that time, the Government had calculated damages of $543,385.94. Doc. 37, ¶ 77. Defendants rejected the Government's offer to settle for twice that amount, insisting that the Government would not be entitled to a dollar more than recoupment for damages. Doc. 264-21 at 2-3. Instead, Defendants—buoyed by an insurance policy that paid their attorneys' fees and costs of litigation—chose to litigate.

C. **Motion to Dismiss and Settlement Conference: February 2020 through February 16, 2021**

Two primary events occurred over the following year: Defendants' Motion to Dismiss and a settlement conference. From February 2020 through the February 2021 settlement conference, we expended an additional 172.9 hours, including responding to the motion to dismiss, preparing for the conference, drafting discovery requests, and other support for AUSA Webster. Had Defendants settled at this conference, applying the rates we request herein, our fees would still have been below $100,000. However, Defendants rejected the Government's offer and chose to take on the risks of litigation, including increased attorneys' fees and costs.

Our briefing on the motion to dismiss was effective: this Court not only denied the motion, it rejected the defense's foundational argument that *Azar v. Allina Health Services* precluded an FCA action. *Compare* Doc. 264-21 (asserting same), *with* Doc. 64 at 15-22 (The Court "can not discern a valid argument that *Allina* has an impact upon its stronger claim."). This was essentially the last time an *Allina*-based defense was raised in this litigation.

This presented a second opportunity for the Parties to resolve this action, at the February 2021 settlement conference. Notwithstanding the Court's strong language in its Order on dismissal, the Parties remained far apart in their negotiations.

D. **Litigation: February 17, 2021 through April 15, 2022**

From that point forward, the Parties were in hotly contested litigation. From February 17, 2021 until April 15, 2022, we incurred 908.5 hours of time.

Throughout this period, we had multiple conversations with AUSA Webster regarding the delineation of responsibilities. Simply put, AUSA Webster—the experienced trial attorney—was primarily responsible for preparing for depositions and trial matters. We—the experienced False Claims Act litigators—were primarily responsible for a substantial medical records and

5

claims review and most of the motions practice, including briefing motions to compel, to amend the complaint, to strike claims, and for both affirmative and defensive summary judgment and Daubert motions. All agreed this would give us the best chance at success.

Defendants, with a $1 million insurance policy limit, had the financial incentive to take a kitchen sink approach to this litigation. Defendants twice extended discovery, pushing trial from March 2022 to November 2022. Docs. 141, 193. They sought extensive discovery, such as unrelated FDA matters, which the Court mostly denied. Docs. 189, 190, 191. They generally opposed every one of Plaintiffs' motions and refused to stipulate to routine matters, such as the authenticity of the Government's claims data, resulting in extensive debate and a deposition of the government contractor. Doc. 230. Even the records review was the result of Defendants engaging in a document dump and declining to provide a substantive discovery response to the Government's one and only interrogatory or to otherwise stipulate to damages.[2]

Certainly, it is Defendants' right to zealously defend themselves, but it cannot be said that our time was unreasonable when it was mostly spent reacting, parrying both Defendants' pointed thrusts and their wild haymakers. And time and again, we were successful in doing so.

**E. Post-Summary Judgment: April 16, 2022 through December 22, 2022**

 From April 19, 2022 until the Settlement Agreement was signed on December 22, 2022, we spent another 127.4 hours working on this matter. This was primarily time relating to preparing for trial, drafting motions in limine, attending the pre-trial meeting in Oxford, and

---

[2] Defendants argued that a meaningful response would require "tens of thousands of pages and hundreds of hours." They produced about 55,000 pages of medical records—mostly for unrelated injections—which Ms. Lang (with some help from a USAO legal assistant) was able to review in under 200 hours, including preparing summary spreadsheets of reimbursements, false records, and total claims that formed the basis for the Government's damages model. Doc. 262-4.

attending the settlement conference in Greenville. Our time for this period lessened significantly because trial preparation was AUSA Webster's forte, and we assisted only as needed.

### F. Post-Settlement: Negotiating and Moving for Attorneys' Fees

After the case was settled, most of our time constitutes "fees on fees"—time incurred negotiating our fees with Defendants, engaging in discovery and related motions practice, and preparing the instant motion with supporting invoice and affidavits. Because we litigated this case with the Government, we had to review the entire statement for redactions to avoid improper sharing of work product. In total, this accounts for 64.9 hours in time.[3]

### G. Costs and Expenses

We kept our costs as lean as we could. For example, notwithstanding this case being litigated during the end of the pandemic, Defendants generally insisted upon depositions being in-person and videotaped. Of the nineteen depositions taken in this case, only one—Mr. Gray's—was attended by relator's counsel. While AUSA Webster and counsel for Defendant attended the other eighteen depositions in person—requiring significant, sometimes out-of-state travel—we usually participated by Zoom video conference.[4]

As a result, our costs and expenses are a mere $4,732.37. As the Court can see from our fee statement, nearly all of our costs and expenses stem from travel to Mississippi for the relator

---

[3] We reserve the right to supplement our statement with additional time incurred addressing our fees-on-fees. Moreover, Defendants continue to address matters relating to the settlement with the Court (*see, e.g.,* Doc. 334), which we must necessarily attend to if only to determine whether action is required to protect the underlying settlement.

[4] Defendants opposed Mr. Gray's request to be excused from personal attendance at the pre-trial conference, which (had they been successful) would have cost over $1,000 in travel from North Carolina. Doc. 288.

interview, Relator's deposition, the pre-trial meeting with opposing counsel, and the pre-trial/settlement conference, expenses that were clearly necessary.

### H. We Exercised Billing Judgment in Removing or Reducing Certain Entries

I personally reviewed every entry in the fee statement and removed all of those relating to time incurred discussing the status of the case in firmwide meetings; time incurred discussing HHS-OIG matters relating to our case; pro hac vice applications; and administrative duties performed by Ms. Lang such as downloading pleadings and calendaring deadlines.

In total, we removed 38.9 hours of time. Doc. 338, Exh. B, ¶ 24. We also reduced our hourly rate by half for time spent traveling. *Id.*

### I. Comparable Cases Evince our Time was Reasonable

We seek less than 1,300 hours for time incurred from the initial intake until this case was settled. While not every False Claims Act case is created equal, a survey of fee awards in other FCA cases generally establishes that our total time was not only reasonable, but that even at higher hourly rates, experienced relator's counsel can ultimately save settling defendants thousands of dollars in fee-shifting.

*U.S. ex rel. Nurkin v. Health Mgmt. Assocs., Inc.* is a recent example of a False Claims Act case that was intervened and litigated by the government for many years. 2021 WL 423772 (M.D. Fla. Feb. 8, 2021). Relator's counsel was an attorney from Flowood, Mississippi with no prior experience with the False Claims Act, as evinced by the many hundreds of hours performing "basic qui tam research" and speaking with his client to develop the legal theories. *Id.* at 12 ("Counsel's research started at the ground floor (researching the 'FCA and how it works' and its elements)"). The court allowed 855.35 hours before the complaint was filed, including 200 hours of qui tam research (reduced from 763.3). *Id.* at 12. The court allowed an additional 1,050.15 hours during the government investigation, including 36 more hours of

8

research (reduced from 190.8). *Id.* at *13-15. In total, relator's counsel spent 954.1 hours

performing basic research and 604.2 hours communicating with his client (in addition to other

tasks) prior to the government even intervening in this case, in addition to other time incurred.

After intervention, relator's counsel was awarded fees for another 445.7 hours despite the

case having been stayed and settled without counsel's involvement. *Id.* at *3, 15-17. In total,

relator's counsel was awarded fees for 2,351.2 hours at a rate of $400 per hour for a case that

was never litigated. *See also U.S. ex rel. Zediker v. OrthoGeorgia*, 407 F. Supp. 3d 1330, 1344-

48 (M.D. Ga. 2019) (reasonable for experienced FCA counsel to spend 685.83 hours pre-filing,

394.64 hours during sealed investigation, 99.34 hours for fees-on-fees); *U.S. ex rel. John Doe I v.

Penn. Blue Shield*, 54 F. Supp. 2d 410 (M.D. Pa. 1999) (3,116.45 hours prior to intervention).

We were heavily involved in this litigation, including drafting most of the briefing,

attending the depositions, and performing an exhaustive document review. Yet, we still incurred

just a fraction of the time other experienced lawyers incur prior to the case even being unsealed.

## J. Conclusion

All of the time, costs, and expenses incurred by our firm were reasonable in light of the

demands of this litigation. As the Court can see, we billed only a small amount of time preparing

and filing the case, yet still succeeded in convincing the Government that intervention was

necessary and appropriate. It was only after the Parties were unable to reach a settlement and this

case entered the litigation phase that we had to spend much time in this matter. We were then

required to expend considerable efforts responding to defense counsel's zealous advocacy,

including preparing and attending eleven depositions and responding to multiple motions seeking

to limit the scope of our case. The Court should find that all of this time was reasonable.

### III. ATTORNEY RATES

The Court should award a rate of $400 per hour for our attorneys—Ms. Bracker, Mr. Peak, and myself—and a rate of $125 per hour for our paralegal—Ms. Lang.

"Congress intended that statutory fee awards be adequate to attract competent counsel, but ... not produce windfalls to attorneys." *City of Riverside v. Rivera*, 477 U.S. 561, 580 (1986) (internal quotation omitted). Where there are not local attorneys with experience in the relevant field, the Fifth Circuit has instructed courts to start with the "home" rates of out-of-state attorneys. *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 382 (5th Cir. 2011) ("Because local rates may well reflect a lower cost of living in the forum, which will also be indicative of lower potential damage awards, the district court retains discretion to adjust the lodestar and achieve an overall reasonable fee award.").

As discussed below and in our affidavits in support, Brad Pigott is generally recognized as the only active attorney in the state who regularly represents False Claims Act relators. Our requested rates may on the higher end of an award in this district, but they are well below our "home" rates. Moreover, rates at the high end or even above the Court's usual range are necessary to attract competent counsel to a state that has a dearth of False Claims Act attorneys, particularly when those same lawyers can opt to bring cases in other districts awarding rates twice or even three times as high.

Were the Court to limit its determination to Mississippi rates, however, our requested rates are still reasonable. When Mr. Gray retained counsel, he could not have expected this would be the first intervened case in the history of the District, and so he needed counsel who would have been willing to litigate this case even without the help of the government.

Bracker & Marcus is one of the premier False Claims Act firms in the country. We exclusively represent relators in *qui tam* actions, have done so in declined cases, and have built a

10

foundation of experience and knowledge that is uncommon in this field. As a result, we are particularly efficient in our preparation and litigation of FCA cases. Our rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation, particularly when considered in light of the *Johnson* factors.

*Nurkin* is a cautionary tale of what can happen when even an experienced litigator attempts to bring a False Claims Act case. A Mississippi attorney with 28 years of litigation experience—including having "successfully litigated complex" tort cases—required 954.1 hours to research "basic legal principles" relating to the False Claims Act, plus another 104.8 hours after the case had been intervened and was in a settlement posture. 2021 WL 423772, at *12, *17. He required another 715.7 hours communicating with the client "to adequately develop a viable theory of the case." *Id.* at *11. Although his time was reduced by the court to reflect "what an experienced attorney… would have reasonably needed" (*id.* at 11), he was still awarded an hourly rate of $400 for 340.8 hours ($136,320) just for "basic qui tam research."

In total, *Nurkin* counsel was awarded $952,480 in hourly fees—at the same rate sought here—for a case that was intervened and settled without litigation. The following year, a judge from the same district awarded Ms. Bracker and me hourly rates of $550 on the basis of our expertise in the False Claims Act. Doc. 135, *U.S. ex rel. Singbush v. Fla. Neurological Center, LLC*, 5:19-cv-603-PGB-PRL (Jun. 22, 2022) ("[T]here is no question that Bracker & Marcus, LLC is a nationally recognized firm and that Ms. Bracker and Mr. Marcus are well-regarded, well-credentialed, and well-experienced attorneys in the field of FCA litigation…."), *report and recommendation adopted in relevant part*, Doc. 135.

Experienced relator's counsel—even at a higher rate—actually *saves* defendants thousands of dollars in fee-shifting. Because we already had an understanding of the

complexities of the False Claims Act and familiarity with Defendants' arguments, we were considerably more efficient than trial counsel with more general experience would have been.

In *City of Burlington v. Dague*, the Supreme Court held that the contingent nature of a fee cannot be the basis for a lodestar enhancement in fee-shifting cases because it is, in part, "ordinarily reflected in the lodestar—either in the higher number of hours expended to overcome the difficulty, or in the higher hourly rate of the attorney skilled and experienced enough to do so." 505 U.S. 557, 562 (1992). Here, our total hours were well below that which the Court might generally see in False Claims Act litigation. Accordingly, a higher hourly rate reflecting our skill and experience is appropriate.

## A. The Court Should Start with Our "Home" Rates

Although forum rates generally apply, the Fifth Circuit has created an exception where "abundant and uncontradicted evidence prove[s] the necessity of… turning to out-of-district counsel." *McClain*, 649 F.3d at 382-83 (affidavits showing "no Texas attorneys were willing and able to assist in such a large case that might drag on for years without any guarantee of financial remuneration"); *see also Jackson Women's Health Org. v. Currier*, 2019 WL 418550, at *5 (S.D. Miss. Feb. 1, 2019) (declarations establishing paucity of attorneys "with the combination of the necessary skills, experience, time, and resources who would have been willing and able" to litigate the case without help from out-of-state counsel); *Doe v. Fitch*, 2022 WL 4002326, at *4 (S.D. Miss. Aug. 1, 2022) (plaintiffs could not have obtained adequate representation, "much less representation of the same quality"). In that instance, counsel's "'home' rates should be considered as a starting point for calculating the lodestar amount." *Id.*

12

1. *This District Lacks Qualified False Claims Act Lawyers Capable of Having Litigated this Case.*

Relator has provided declarations of three Mississippi lawyers—each of whom has experience with False Claims Act matters—who have testified that out-of-state counsel was necessary to litigate this case. Cliff Johnson was originally Relator's local counsel, but he left private practice in 2017. Brad Pigott replaced Mr. Johnson as local counsel.

In 2015, when Relator engaged our firm, Messrs. Pigott and Johnson were the only two attorneys in the state who had meaningful experience with False Claims Act matters. A third declaration has been provided by John Hawkins, a trial attorney who associated with Messrs. Pigott and Johnson to litigate an intervened FCA case (*Aldridge*) filed in 2016. His declaration states that Pigott and Johnson were the only qualified FCA lawyers he was aware of in the state, which is why he associated with them to help with *Aldridge*.

Retaining experienced counsel from outside smaller districts is necessary and common for "bet the company" litigation. *See* Doc. 280; *see also U.S. ex rel. Zediker v. OrthoGeorgia*, 407 F. Supp. 3d 1330, 1343 (M.D. Ga. 2019) (Atlanta rates appropriate because "no local attorneys specialize in FCA litigation, although some may from time to time handle an FCA case"; "both relators and *qui tam* defendants frequently hire lawyers from outside the Middle District, and those lawyers often charge considerably more than lawyers in the Middle District typically charge"). Defendants themselves looked outside of the district, hiring counsel from Jackson. Such was the case in other FCA litigation in this district. *See U.S. ex rel. Jehl v. GGNSC Southaven, LLC,* No. 3:19-CV-091-NBB-JMV (relator's counsel from Nashville; defense counsel from Washington, D.C.); *U.S. ex rel. Jamison v. McKesson Corp*., No. 2:08-CV-214-SA-DAS (relator's counsel from California; defense counsel from the same D.C. firm).

This case was a trial by fire for AUSA Webster—a veteran trial attorney but a brand new AUSA who needed experienced *qui tam* counsel on his side. As discussed above, I prepared the majority of the legal briefing, which was generally led to favorable results for the Government. We spent many hours discussing Defendants' legal arguments and working through the various evidentiary standards. Concepts such as the three-headed scienter requirement, the *Escobar* materiality standard, damages calculations, and the two-pronged statute of limitations are not simple. Qualified relator's counsel was vital to achieving the end result, a $1.9 million recovery.

2. *Bracker & Marcus's 2022 Hourly Rates Were Approved by its Home Courts.*

Bracker & Marcus LLC is based in Atlanta, GA. In *U.S. ex rel. Hawkins v. OGCC Behavioral Health Services, Inc.*, 1-15-CV-4380-RWS—in which the Government intervened and settled without litigation—Judge Richard Story of the Northern District of Georgia, Atlanta Division, awarded us our full fees and 2022 rates of $670 for Ms. Bracker, $635 for Mr. Marcus, and $150 for Ms. Lang. *See* Doc. 338, Exh. B, ¶ 18. The same year, we were awarded those rates—excepting a rate of $200 for Ms. Lang—by a mediator. *Id.*, ¶ 19.

Mr. Peak has experience similar to my own, including thirteen years of representing relators. *Id.*, ¶¶ 8-11. He is located in Washington, D.C., and so his home rate is governed by the Laffey Matrix. *See U.S. ex rel. Raggio v. Seaboard Marine, Ltd.*, 2017 WL 2591288, at *3-4 (D.D.C. May 4, 2017). Under the Laffey Matrix, Mr. Peak's hourly rate is $829.[5]

With these home rates as the "starting point" for the Court's consideration, our requested rates of $400 for attorneys and $125 for a paralegal are justified.

---

[5] http://www.laffeymatrix.com/see.html

3. *False Claims Act Cases are Important to Local Communities.*

It is important that local communities have access to lawyers who can handle all types of matters, but False Claims Act cases can have a particularly meaningful impact. Although these cases are premised on false government billing, successful FCA cases frequently involve allegations that directly affect program beneficiaries. Healthcare cases, in particular, are often premised on issues that implicate patient well-being. Some examples, FCA cases are commonly premised on medically unnecessary procedures, worthless services or inadequate care, services performed by unqualified providers, or the use of a potentially unsafe product. Even in cases limited to billing fraud, Medicare recipients have to pay larger copayments from fixed incomes.

Access to competent False Claims Act counsel can have real world effects on hundreds, sometimes thousands of people. We can take cases with low potential damages if we can expect to recover a fair hourly fee, but experienced FCA attorneys can rarely afford to sacrifice both.[6]

**B. Our Rates are Reasonable Under Statewide Prevailing Market Rates**

Were the Court to decide that counsel from out-of-state was unnecessary, at least one court has determined that it is appropriate to look across "the entire state of Mississippi" when determining prevailing market rates. *Pickett v. Mississippi Bd. of Animal Health*, 2021 WL 4979009, at *4 (S.D. Miss. Oct. 26, 2021) ("Mississippi does not enjoy a large market for legal services, by national or regional standards.").

We were unable to find any False Claims Act fee awards out of this District, but opinions out of the Southern District of Mississippi support our rates. In *U.S. ex rel. Rigsby v. State Farm*

---

[6] Conversely, because FCA cases can have potentially enormous damages, inexperienced FCA counsel may be incentivized to take on a case with immaterial or otherwise defective allegations, wasting judicial resources.

*Fire & Cas. Co.,* the court awarded a $400 hourly rate to lead counsel from D.C. with approximately twenty years of experience and a customary rate of $600; a $358 hourly rate for a partner from D.C. with under fifteen years of experience and a customary rate of $595; and a rate of $124 for a local paralegal with a customary rate of $165. 2014 WL 691500, at *14-17 (S.D. Miss. Feb. 21, 2014) (basing rates on "experience and the complexities of this *qui tam* case").[7]

Ms. Bracker has twenty-one years of experience, and Mr. Marcus and Mr. Peak have seventeen years of experience. All have customary rates higher than lead counsel in *Rigsby*. Most importantly, *Rigsby* was decided nine years ago, when rates—and the value of those rates—were significantly lower. Compared to the rates awarded in *Rigsby* in 2014, hourly rates of $400 in 2023 for attorneys with similar experience and higher customary rates are conservative.

In *U.S. ex rel. Aldridge v. Corporate Mgmt. Inc.*, the Southern District of Mississippi awarded rates of $450 to Mr. Pigott, $425 to Mr. Johnson, and $400 to Mr. Hawkins. 2022 WL 983167 (S.D. Miss. Mar. 30, 2022). The court looked closely at *Rigsby* when making its determination, including considering that although the case was intervened, the relator's attorneys "act[ed] as lead counsel for the Relator, and were preparing to take the case forward had the government not intervened." *Id.* at *8 (distinguishing attorney with similar experience— awarded a $375 hourly rate—who declared he would not have accepted the case as lead counsel). Messrs. Pigott and Johnson's rates were based on their experience as *qui tam* attorneys, while Mr. Hawkins' lower rate was based on his general experience as a trial lawyer. Notably, Mr. Johnson and Mr. Hawkins were only one year apart out of law school, and Mr. Johnson mostly

---

[7] Even the defendants' declarant claimed a rate of $358 was "average for senior partners in complex commercial litigation cases in Mississippi" and that $124 was "a reasonable paralegal rate in this area." *Id.*

16

did "the preliminary work on the case" before withdrawing, but the court still awarded him a higher hourly rate because of his "experience litigating *qui tam* cases, specifically." *Id.* at *9.

What we may lack in years of general experience, compared to Messrs. Pigott and Johnson, we more than make up in terms of False Claims Act experience. Even Mr. Pigott indicated that he had only "personally filed or served as lead counsel in over a dozen" Medicare fraud cases in private practice. *Id.* By contrast, since we opened our firm in 2015, Ms. Bracker and/or I have been lead counsel on **seventy-nine** False Claims Act cases, including twenty-six intervened settlements and eighteen settlements in declined cases.[8] We even had a prior intervened settlement involving improper billing of viscosupplementation agents. This does not even include the prior combined fifteen years representing relators before starting our firm.

Regardless, if Messrs. Pigott and Johnson were the only attorneys in the state qualified to litigate a False Claims Act case in 2015,[9] it would be inappropriate to compare our credentials to theirs. They would have been the only in-state attorneys Mr. Gray could have hired, and so the prevailing market rate for the state of Mississippi is necessarily $425 to $450. Instead, he went to a higher paying market and found equally qualified attorneys who are requesting a *lower* hourly rate of $400—rates that match what counsel with similar experience received nearly *nine years ago*. The Court should award our requested rates, which have been established as "adequate to attract competent counsel" to the District without producing a windfall. *Rivera*, 477 U.S. at 580.

---

[8] Until 2019, Ms. Bracker and I were the only lawyers in our firm. None of these were cases where we merely oversaw another attorney who was primarily responsible for the case.

[9] *Aldridge*—filed in 2016—was Mr. Hawkins's first FCA case. He was not actively seeking FCA cases in 2015, and he still does not advertise for FCA cases. Still, were he included, the prevailing market rates would be $400-$450, and our rates would fall within that range.

**C. Our Rates are Reasonable for Oxford when Accounting for Inflation and the Complexities of False Claims Act Litigation**

The Supreme Court has found it appropriate to compensate counsel for a long delay in payment by applying "current rather than historic rates." *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 284 (1989) ("Clearly, compensation received several years after the services were rendered… is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings."). Moreover, in long-lasting cases such as this, the Fifth Circuit requires the Court to address whether a delay enhancement is warranted, particularly if the Court determines that rates have not changed. *Islamic Ctr. of Mississippi, Inc. v. City of Starkville, Miss.*, 876 F.2d 465, 474 (5th Cir. 1989), *overruled on other grounds by Shipes v. Trinity Indus.*, 987 F.2d 311 (5th Cir. 1993).

Recently, in standard litigation, other judges in this district have awarded hourly rates of $385 for "an attorney with twenty years of experience" and $150 for a paralegal. *Mass. Mut. Life Ins. Co. v. Williamson*, 2020 U.S. Dist. LEXIS 4318, at *4–5 (N.D. Miss. Jan. 10, 2020) (cited favorably by *Gaskill-Clayborn v. Mighty Oaks Child Dev. Ctr., LLC*, 2021 WL 4317669, at *5 (N.D. Miss. Sept. 22, 2021)). This Court, conversely, has cited *Auto Parts Mf'g Miss. Inc. v. King Constr. of Hous., LLC*, 258 F. Supp. 3d 740, 756 (N.D. Miss. 2017), for its opinion that "an hourly rate of $250-$300 is customary" in this district. *See, e.g.,* Doc. 146, *Cooper v. Majestic Miss., LLC*, 3:18-cv-00260-MPM (May 25, 2022). Even before getting to the *Johnson* factors, discussed below, there are three distinctions to be made between *King* and the instant case.

First, *King* was discussing the customary hourly rates for "a standard civil case in north Mississippi." 258 F. Supp. 3d at 755. It was a routine contract dispute. *Cooper* was an employment case. The case at bar is complex litigation in an ever-changing area of the law. In *Aldridge*, the court credited the affidavit of attorney John G. Corlew, who stated that that "[f]or

18

complex high stakes or high-risk litigation in the Southern District of Mississippi, I believe that customary and reasonable rates currently charged by litigation partners in Mississippi firms and/or regional firms with offices in Mississippi are in the $400-$500 range." 2022 WL 983167, at *8. This Court should apply a similar range.

Second, *King* was decided in June 2017. Since then, U.S. inflation reached a 40-year high. A six-year-old opinion is not a true indicator of the current market. The Court should consider how market rates have changed as a result of inflation because law firm rates would certainly rise along with everything else in the economy. *C.f. Laudermilk v. Fordice*, 1997 WL 786776, at *4 fn. 2 (N.D. Miss. Nov. 14, 1997). Thus, even if customary rates for attorneys were between $250 and $300 in June 2017, when adjusted for inflation, that equates to between $303 and $363 in December 2022 dollars.[10] A $100 paralegal rate in June 2017 would be akin to a rate of $121 in December 2022. This adjustment is likely to be higher by the time the Court rules.

Third, *King* was decided in the Aberdeen Division. When determining local prevailing rates, the Court should look specifically to "the community in which the district court sits," which, in this case, is Oxford. *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002). With all due respect to the rest of the District, this Court is located in a cultural and scholastic oasis. But culture comes at a price, literally. Modest sized homes valued in the high six and low seven figures surround the historic square; newly constructed townhomes behind the federal courthouse are listed for $1.65 million.[11] A $20 pizza at St. Leo and $10 muffin and latte at Heartbreak Coffee are not prices that evoke thoughts of a small town in Mississippi. The prevailing market

---

[10] https://www.bls.gov/data/inflation_calculator.htm

[11] https://www.zillow.com/homedetails/1000-Jefferson-Ave-UNIT-A-Oxford-MS-38655/2080977377_zpid/?

rates should reflect the heightened costs of living for a lawyer who hangs a shingle and raises a family near downtown Oxford as opposed to the rest of the region.[12] *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 570 (2010) (Breyer, J., concurring) ("a lawyer's 'fee' is substantially greater than his 'profit,' given that attorneys… cover routine overhead expenses, which typically consume 40% of their fees").

For these reasons, $400 is a reasonable hourly rate for False Claims Act specialists practicing in Oxford, Mississippi, even before considering the *Johnson* factors.

## IV.  THE JOHNSON FACTORS FAVOR A HIGHER FEE

Once the Court has determined the lodestar, it "may then determine whether any other considerations counsel in favor of enhancing or decreasing the lodestar." *Combs*, 829 F.3d at 394-95. This includes the twelve so-called *Johnson* factors, which are:

> (1) the time and labor required to represent the client or clients; (2) the novelty and difficulty of the issues in the case; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment by the attorney; (5) the customary fee charged for those services in the relevant community; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Gurule v. Land Guardian, Inc*., 912 F.3d 252, 257 n.3 (5th Cir. 2018).

The Fifth Circuit has held that the Court should "give special heed" to factors 1, 5, and 9, but "the degree of success obtained" is "the most critical factor." *Migis v. Pearle Vision, Inc*., 135 F.3d 1041, 1047 (5th Cir. 1998) (citing *Von Clark v. Butler*, 916 F.2d 255, 258 (5th Cir. 1990) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)).

---

[12] The incongruity of this argument being raised by out-of-state counsel is not lost, but a rising tide lifts all boats.

Different courts address the factors in different ways, applying some factors to the lodestar analysis and others to an upward or downward adjustment. For example, time and labor is readily subsumed by the court's reasonableness analysis, and we have already addressed why the skill required and our reputations and experience warrant the requested rates.

We do not seek an upward adjustment from the total award. Rather, we direct the Court to certain factors as additional reasons as to why we deserve the requested rates.

1. *We Achieved a Great Result for the Taxpayers.*

"'[T]he most critical factor' in determining a reasonable fee 'is the degree of success obtained.'" *Combs*, 829 F.3d at 394 (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983)). The Court "is obligated to give primary consideration to the amount of damages awarded as compared to the amount sought." *Farrar v. Hobby*, 506 U.S. 103, 114 (1992).

At the start of this litigation, the Government identified $543,385.94 in damages. Doc. 37, ¶ 77. Defendants offered to settle for that amount, arguing that a 2019 Supreme Court decision prohibited the Government from even prosecuting this as a False Claims Act case. Doc. 264-21. AUSA Webster, in turn, offered to settle the case for less than $1.1 million. *Id.* Defendants refused, stating "there is no way I could recommend to Dr. Mitias to pay $1,000,000 without seeing the evidence." *Id.* After litigating this case for another two years—defeating multiple motions and arguments seeking to dismiss the case or limit the exposure—we settled this case for over $1.9 million. By any metric, Plaintiffs achieved an excellent result in this case.

To our knowledge, this is the first and only intervened False Claims Act settlement, and the largest FCA recovery, in the history of the District. This case and the resulting settlement sent a message that this District is not friendly to fraud, and that this USAO will not stand by and allow fraud to be committed on its watch.

2. *This Case was Replete with Novel and Difficult Issues.*

By its very nature, the False Claims Act is a novel area. The statute is amended about once every decade. Supreme Court decisions such as *Escobar* (materiality) and *Hunt* (statute of limitations) can turn seemingly understood concepts on their heads. Circuit splits abound with regards to even basic issues such as pleading requirements and scienter. The seal, public disclosure bar, and first-to-file rule are just some of the unique elements that create potential pitfalls for inexperienced relator's counsel. As was a common theme in Defendants' briefing throughout this case, that the allegations involved Medicare billing guidelines only further complicated matters. *See, e.g.,* Doc. 265 at 16 (arguing they could not have navigated the "thousands of complex statutory and regulatory provisions").

Defendants raised three novel arguments in their motion to dismiss: the billing guidelines were too ambiguous; defendants must have knowledge of materiality; and a 2019 Supreme Court decision retroactively prevented the Government from pursuing this matter as a False Claims Act case. Doc. 43. Rejecting these arguments but noting that it might revisit them, the Court advised the parties to "take stock of the difficult issues in this case." Doc. 64.

Discovery presented its own set of unique challenges, such as the relevance of FDA classification of the compounds as drugs versus devices (Doc. 189) and whether Defendants should be granted access to every federal investigation of compounded hyaluronic acid over the previous thirteen years (Doc. 191).

Summary judgment showcased even more complex questions. One key issue was whether Medicare would have reimbursed Defendants for the compounds had it known that they were not the brand name products, and if so, for how much. *See, e.g.,* Doc. 265, *passim* (seeking a ruling that some claims would have been paid "at a lower" but unstated rate). This argument was premised on application of the Federal Food, Drug, and Cosmetic Act to compounds

originating from different facilities under different circumstances and undecided questions regarding the burden of proof with regards to offsets. *See, e.g.,* Doc. 265 at 29-32. The Court ultimately declined to rule on these and certain other issues at summary judgment, recognizing that it was not an expert on "such complex matters as the arcana of federal Medicare billing codes and practices" and finding that it required "an education regarding these complex matters." Doc. 280 at 14. Defendants then raised yet another novel question when it asked the Court to reconsider how to apply the statute of limitations in light of the amended complaint and relation back doctrine. Docs. 282, 283.[13]

In sum, this was not a run-of-the-mill False Claims Act case, let alone a standard civil case. Defendants threw the kitchen sink at Plaintiffs throughout this litigation, raising many new and creative arguments that required a great deal of thought and research. We addressed them all.

### 3. This Case was Undesirable for False Claims Act Counsel.

In addition to the contingent fee arrangement and risk of no recovery, two additional factors made this case undesirable. First, Defendants were funded by a million-dollar insurance policy. As long as Lloyd's of London was footing their legal bills, Defendants had little incentive to settle this case. *See Cruson v. Jackson Nat'l Life Ins. Co.*, 2021 WL 3702483, at *6 (E.D. Tex. June 4, 2021) ("[T]he 'risk of non-recovery' and 'undertaking expensive litigation against well-financed corporate defendants on a contingent fee' has been held to make a case undesirable, warranting a higher fee."). Defendants requested two extensions to discovery and were on the courthouse steps before this case was resolved.

---

[13] The Court denied the motion before we could file our prepared response brief.

A second reason this case was undesirable was the limited potential recovery. According to the Government, single damages were just $543,385.94, a small case by False Claims Act standards.[14] Furthermore, at the end of the seal period, Defendants offered to settle the case for that amount, and so our upside was limited. From a purely economic standpoint, the smart business decision would have been to avoid incurring additional time. But "FCA awards are designed, in part, to be punitive and to serve a deterrent effect." *U.S. ex. rel. Montcrieff v. Peripheral Vascular Assocs., P.A.*, 2023 WL 139319, at *17 (W.D. Tex. Jan. 9, 2023)) (citing *U.S. v. Bornstein*, 423 U.S. 303, 309 n.5 (1976)). If a defendant is only made to repay what they received for the fraud—and to do so primarily from an insurance policy—then the False Claims Act has no teeth. We felt strongly that justice required that this case be litigated, and we were willing to assist the government, even knowing the economics of this case.

Over the next two years, we spent over 1,000 hours on this case, time that could have been incurred on larger cases in venues paying higher hourly fees.[15] Because of our commitment to this case, we assisted the Government in recapturing another $1.36 million for the taxpayers.

### 4. This Case Precluded Other Employment by our Firm.

At the start of 2020, our firm consisted just of Ms. Bracker, Ms. Lang, and me. Doc. 338, Exh. B, ¶ 13. Despite having just opened our doors in 2015, we became one of the most prolific FCA firms in the country. *Id.* Demand for our services only increased after achieving stellar

---

[14] Relators only receive 15%-30% of the total recovery. Several veteran relator's counsel have thresholds of up to $10 million in damages before they will even consider bringing a False Claims Act case, and so many of our colleagues were surprised to hear that we had undertaken this litigation.

[15] In the last year, Ms. Bracker, me, and Ms. Lang have twice been awarded hourly rates of $670, $635, and $150, respectively. Doc. 338, Exh. B, ¶ 18-19. We also settled a case in which defendants agreed with 2022 hourly rates of $715 and $285. *Id.*, ¶ 21.

results, including an $84.5 million settlement in a kickback case. *Id.,* ¶ 14-16. In the last three years, we have added three more attorneys to keep up with demand.

In January 2020, AUSA Webster sought our assistance in litigating this matter. As noted, we understood the damages were low for a False Claims Act case. But we felt the egregiousness of Defendants' fraudulent conduct over an eight-year period required meaningful consequences.

This put a significant strain on our resources, as this matter required most of my attention, Ms. Bracker was lead counsel in a multi-hundred million dollar declined False Claims Act case, and we had dozens of other sealed and prospective cases. Because of the constant demands of this case, we had to refer out a number of promising *qui tam* cases and make difficult decisions with regards to litigating declined cases, including finding co-counsel and offering sizeable shares of cases in exchange for their assistance.

## V. CONCLUSION

The Government valued damages in this case at $543,385.94. Defendants had the opportunity to settle this case for about twice that amount—$1,086,771.88—but they declined. Although their own legal fees were being paid for by insurance, they should have understood this was not a free bite at the apple and that, if they lost, they would be responsible for Relator's attorneys' fees. They were certainly made aware of this fact at the February 2020 settlement conference. They decided to press their luck, and they lost.

The flip side of the coin, we had the opportunity to settle on Defendants' terms, but we took a risk and won. The results of our efforts are quantifiable. After just 93.9 hours of time preparing and assisting with the investigation of the case, Defendants offered to settle for $543,385.94. Another 1,208 hours of time in litigation resulted in the recovery of 3.5 times that amount, an additional $1.35 million. We request only a fraction of the total recovery and of the value we added to the Government's case.

25

The Court should enter an award of $449,720 in fees and $4,735.37 in costs and expenses.

Respectfully submitted this 7th day of February, 2023.

/s/ Jason Marcus
Jason Marcus (admitted *pro hac vice*)
Georgia Bar No. 949698
**BRACKER & MARCUS LLC**
3355 Lenox Road, Suite 660
Atlanta, GA 30326
Tel. (770) 988-5035
Fax (678) 648-5544
Jason@FCAcounsel.com

/s/ Brad Pigott
J. Brad Pigott
Mississippi Bar No. 4350
**Pigott & Johnson, P.A.**
775 North Congress Street
Jackson, MS 39202
Tel. (601) 354-2121
Fax (601) 354-7854
bpigott@pjlawyers.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record on this the 7th day of February, 2023.

/s/ *Jason Marcus*
Jason Marcus